# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 29, 2014

## STATE OF TENNESSEE v. MARIO D. TAYLOR

**Appeal from the Criminal Court for Sumner County**
**No. 2011CR45      Dee David Gay, Judge**

---

### No. M2013-02667-CCA-R3-CD - Filed March 31, 2015

---

Appellant, Mario D. Taylor, was convicted of aggravated burglary, aggravated robbery, employing a firearm during the commission of a dangerous felony, and three counts of aggravated assault.  The trial court sentenced him to an effective sentence of twelve years.  On appeal, appellant argues that: (1) there was insufficient evidence to support his convictions; (2) his conviction for employing a firearm during the commission of a dangerous felony violates his double jeopardy rights; (3) the trial court erred by refusing to allow a lay witness to testify regarding appellant's mental and physical health; and (4) the trial court erred by refusing to allow appellant to introduce the entirety of his videotaped interrogation.  Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined.  ROBERT H. MONTGOMERY, JR., J., filed a separate concurring and dissenting opinion.

Jeremy W. Parham, Manchester, Tennessee, for the appellant, Mario D. Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Lawrence Ray Whitley, District Attorney General; and Tara Wyllie, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case concerns a home invasion during which the perpetrators wore bandanas covering their faces and demanded money and guns from a family while one of the perpetrators pointed a gun at the family members.  One of the perpetrators took the mother's

purse from the home. Appellant was indicted for and convicted of aggravated burglary, aggravated robbery, employing a firearm during the commission of a dangerous felony, and three counts of aggravated assault. Appellant's trial began on April 17, 2012.

## I. Facts from Trial

Cathy[1] testified that on October 17, 2010, she was living in her Sumner County home with her husband; her older daughter Ashley, age 26; her son Zachary, age 15; and her younger daughter Caitlyn, age 13. All five members of the family were at home on October 17. Cathy explained that they returned to their home after a Sunday night church service at approximately 7:30 or 7:35 p.m. and had been home for twenty to twenty-five minutes when she heard a knock at the door. At the time, she and her children were downstairs, her older daughter was in the bathroom, and her husband was upstairs. Her son went to the door, asked who was outside, and opened the door. Two men came inside the house wearing bandanas, one orange and one red; "stocking caps"; and gloves saying, "'Everybody on the floor. Everybody get on the floor.'" One of the men, who was wearing black, rectangular-framed glasses and a red bandana, pushed her son, and her son responded, "'Man, what you want? What you want?'" The men then came toward Cathy, and the man wearing the red bandana and glasses put a gun to the back of her son's head. She instructed her children to "'[j]ust do what he says.'" The men ordered everyone to lie on the floor and keep their eyes on the floor. Cathy heard a lot of noise as the men moved about her home. She also heard someone ask where the family's guns were located and if anyone else was in the house. When her younger daughter made noise, one of the men said, "'Oh shut up. I ain't going to shoot you.'" Cathy explained that shortly thereafter it suddenly became quiet. She heard a sound as someone came down the stairs. Her son said, "'They're gone.'" They got up from the floor, closed the door, and called the police. Cathy stated that the entire incident lasted approximately ten to fifteen minutes. Cathy later found that the only thing missing from her home was her purse. Cathy was shown a picture from which she identified her purse, wallet, and other items that had been inside her purse when it was taken from her home. Cathy also identified a pair of glasses that looked the same as the glasses worn by the perpetrator who held a gun to her son's head.

During cross-examination, Cathy stated that she saw one of the perpetrators with a gun in his hand and that the second perpetrator "had something similar in his hand." However, she conceded that the second individual never pointed a gun at any of the members

---

[1] It is the policy of this court to protect the identity of minors. Therefore, we will refer to any individuals who were minors at trial or during the commission of the offenses by their first names. We will also refer to the adult victims in this case by their first names in order to protect the identity of the victims who were minors. In doing so, we mean no disrespect.

of her family. Cathy also conceded that her written statement to law enforcement did not contain an assertion that the second perpetrator had a weapon. Cathy agreed that she had never identified appellant in a line-up and explained that the perpetrators had their faces covered while in her home. Cathy agreed that no one was physically injured during the incident. Cathy testified that after the incident, she saw at least eight text messages from Kelsey, a teenage girl who lived across the street, saying, "'[Zachary], are you home?'" She said that the messages all arrived shortly before and during the incident. Cathy explained that it was normal for her son to receive those types of text messages.

Caitlyn, Cathy's younger daughter, testified next that when she heard the knock at the door, her brother went to the door and asked, "'Who is it?'" She heard a murmur, and her brother again asked, "'Who?'" Caitlyn heard the person outside the door respond, "'Jrock. Open the door.'" After her brother opened the door, one of the perpetrators pointed a gun at her brother and ordered everyone to lie on the floor. However, Caitlyn remained standing. Caitlyn testified that the perpetrators began asking, "'Where's the .357?'" and, "'Where's the money?'" One of the men asked Caitlyn who was upstairs, and she responded, "'Nobody.'" The two men went upstairs but then turned around and exited the home. Caitlyn recalled that one of the men was wearing an orange bandana, but she could not "really place" the other perpetrator. She believed that the perpetrator wearing the orange bandana pointed the gun at her brother, but she could not see either man's face. Caitlyn asserted that both men had weapons but that neither ever pointed a gun at her. Caitlyn explained that she was "really scared" during the incident because she did not want anyone to harm her family and that she was so afraid that she had to sleep with her sister the night of the incident. During cross-examination, Caitlyn explained that the two men sounded like they were teenagers. Caitlyn conceded that she only actually saw one gun during the incident.

Zachary, Cathy's son, testified that on the night in question, he opened the door to his home after a person knocking on the door identified himself as "'Jrock.'" Zachary stated that there were two men standing outside and that the man standing closest to the door put a gun to Zachary's neck. The man told Zachary "'[t]o get back and get on the ground.'" Zachary saw the other perpetrator point a gun at his sister. When the men asked for guns and money, Zachary responded that they did not own "'that kind of stuff.'" One of the men replied, "'Yeah you do. Where is the .357 and the nine,'" to which Zachary responded that he did not "'know anything about that stuff.'" The men went upstairs but suddenly ran back down the stairs and out of the house. Zachary then saw his father walking down the stairs carrying his pistol. Zachary stated that the men were wearing bandanas, dark clothes, and gloves and that the man who pointed a gun at him was wearing glasses. Zachary could not remember what color bandana the man wearing the glasses wore but stated that the other man wore an orange bandana. Zachary stated that Kelsey was a girl who lived across the street. He explained that at the time, he had known Kelsey for about a month and that it was not

uncommon for her to text him. Zachary stated that immediately after the incident in question, he realized that he had received numerous text messages from Kelsey asking if he was at home. Zachary explained that he could not identify the two perpetrators because they kept their faces covered while in his home.

During cross-examination, Zachary explained that he opened the door because he assumed that "Jrock" was a friend whose name started with "J" and that the friend was using a nickname. Zachary conceded that he did not tell law enforcement officers that both men had weapons when he gave a statement after the incident. Zachary explained that prior to this incident he had been "talking" to Kelsey as a prelude to dating but that they "fell at odds" when she began "talking to" one of his friends. Zachary stated that it was unusual for Kelsey to text him repeatedly to inquire as to his whereabouts. Zachary recalled telling detectives that the man who pointed a gun at him wore a red bandana.

Ashley, Cathy's older daughter, testified next that on the evening of October 17, 2010, she was walking into the bathroom when she heard a knock at the door. While she was in the bathroom, she heard her brother and mother have a conversation about who was at the door. She then heard the door open and heard a man's voice. She heard someone say, "'Shut up.'" She heard her sister scream and heard a man's voice say, "'Get on the ground.'" She heard some "shuffling around," and someone said, "'Where's the guns?'" Her brother responded that they did not own any weapons, to which a man responded, "'Yeah, you do. Where's the .357 and the nine?'" Ashley heard her sister scream and heard a man say, "'Shut the F up. We're not going to shoot you.'" Ashley heard a lot of "shuffling around" and heard the men ask, "'Who else is here?'" before the perpetrators left the house. Ashley stated that while she was in the bathroom, she had a cellular telephone that all the members of her family used. She said that she received three or four text messages from Kelsey to Zachary asking if Zachary was at home. During cross-examination, Ashley agreed that she was inside the bathroom for the duration of this incident and did not see any of the individuals who came into her home.

Kelsey, the teenage female who lived across the street from the home in question, testified next that prior to October 17, 2010, she had known Zachary for one to two months and that they had mutual friends. Kelsey stated that Jeremy Martin was an ex-boyfriend and that Mr. Martin was at her house on October 17. Mr. Martin came to Kelsey's home with Lavontray Woodley and a male and female whom Kelsey did not know. Mr. Martin was wearing black jogging pants and a black shirt. Mr. Woodley was wearing a black shirt and shorts and a hat. Kelsey stated that Mr. Martin retrieved a letterman jacket he had left at her home and asked for a bandana. Kelsey explained that she gave Mr. Martin red and orange bandanas. Kelsey said that Mr. Martin's nickname was "Jrock." Kelsey asserted that she did not talk to Mr. Martin about Zachary that night but that she and Mr. Martin had spoken about

Zachary in the past. Kelsey testified that she sent Zachary text messages that night because she and Zachary had "exchanged words" a couple of days prior, and she wanted to talk to him about it. Kelsey stated that she only learned of the incident at Zachary's home when Zachary called her after it occurred. Mr. Martin also later told her that he had gone in the home and had taken a purse.

Chareece, Mr. Woodley's girlfriend, testified that on October 17, 2010, she went with Mr. Martin, Mr. Woodley, and "Money" (appellant) to retrieve a jacket from Mr. Martin's girlfriend, Kelsey. Chareece explained that she and Mr. Woodley waited in the car while Mr. Martin went inside Kelsey's house and that appellant stood outside the vehicle. Kelsey came outside and spoke to Mr. Woodley. During this conversation Mr. Martin and appellant walked away, but Chareece did not know where they went. Chareece described appellant as a tall, African American male and stated that he was wearing "all black" "shades" on the night in question. Chareece explained that the two men were gone approximately fifteen to twenty minutes and that when they returned, appellant was carrying a bag. It was not until all four individuals left Kelsey's home and were driving on the interstate that appellant stated that there was "'nothing in the bag.'" Someone, Chareece could not remember who, threw the bag out of the car window. During cross-examination, Chareece stated that she never saw any weapons on October 17.

Lavontray Woodley testified that on October 17, 2010, he, Chareece, Mr. Martin, a.k.a. "Jrock," and appellant, a.k.a. "Money," went to Kelsey's apartment to retrieve Mr. Martin's jacket. Mr. Woodley stated that after Mr. Martin and appellant went inside Kelsey's apartment, Kelsey came outside to the car to speak with him. Mr. Martin and appellant then walked away, and Mr. Woodley thought that Kelsey went with them. They had been gone for approximately thirty to forty minutes when Mr. Martin came jogging back to the car, and appellant was running behind Mr. Martin trying to catch up. Mr. Woodley did not notice either man carrying anything. However, Mr. Woodley later saw appellant going through a purse and talking about how he "didn't have nothing." Mr. Woodley then saw appellant throw the purse out of the car window.

During cross-examination, Mr. Woodley stated that he and Chareece sat in the car talking while Mr. Martin and appellant were gone. Mr. Woodley confirmed that both Mr. Martin and appellant went inside Kelsey's apartment. Mr. Woodley explained that appellant threw the purse out of the car window near downtown Nashville and that he never saw anyone in the possession of or wearing a bandana that evening.

Jeremy Martin testified next that as of October 17, 2010, he had known appellant for one to two months. Mr. Martin explained that he, appellant, Mr. Woodley, and Chareece went to Kelsey's house to pick up a jacket he had left there. He stated that after he had

retrieved his jacket, he, appellant, and Kelsey were standing outside, and appellant stated that he wanted to commit a robbery. Kelsey gave them a red bandana with "little teddy bears" on it and an "orangish, pink-looking" bandana with flowers on it. Mr. Martin, appellant, and Kelsey left Mr. Woodley and Chareece sitting in the car, and the three walked around the apartment complex. During the walk, Kelsey pointed to a house and told the two men that there were guns and money inside. Mr. Martin asserted that Kelsey was aware that they were planning to rob someone. Mr. Martin and appellant proceeded to cross the street to rob the house, leaving Kelsey at her apartment complex.

Mr. Martin explained that appellant knocked on the victims' door and that when asked who was outside, appellant responded "'J[r]ock.'" Mr. Martin did not know why appellant used Mr. Martin's nickname. Mr. Martin had a rock in his hand but did not have a gun, and Mr. Martin did not know that appellant had a weapon until someone opened the door and appellant drew the gun. Appellant then pointed the gun at one of the victims. Mr. Martin remembered that there was a mother and two children, a male and female, inside the house. Once inside the house, appellant demanded that everyone get on the floor. Appellant also told the female child that no one was going to shoot her. Mr. Martin explained that appellant told him to go upstairs but that he fled the home when he heard someone else moving about upstairs. Mr. Martin asserted that appellant took the purse from the house. When appellant looked inside the purse while they were driving down the road, he told Mr. Martin that he had "hit a dry lick," meaning that he did not get anything of value. Mr. Martin explained that appellant threw the purse and all of its contents out of the car window. Mr. Martin admitted that he had already pleaded guilty to robbery and that part of his plea agreement was that he testify truthfully at appellant's trial. Mr. Martin testified that he is 5'6" or 5'7" and that appellant is four to five inches taller than he. He also stated that on the night of the robbery, appellant was wearing square glasses with gold trim.

During cross-examination, Mr. Martin explained that a week or two prior to the incident, he and Kelsey had ended their three-year relationship and that they were "just conversating" after the breakup. Mr. Martin stated that he was the only person to go inside Kelsey's apartment that night. He testified that he wore the red bandana. Mr. Martin stated that the lenses in appellant's glasses were clear and that neither he nor appellant were wearing gloves during the robbery. Mr. Martin also agreed that he and appellant had an altercation when they first met.

Steve Malach, a detective with the Hendersonville Police Department, testified that he accompanied another detective to serve an arrest warrant on appellant on November 2, 2010. He explained that appellant was arrested, read his *Miranda* rights, and placed in the police car. The two detectives spoke to appellant on the thirty- to forty-five-minute drive back to the police department. During the drive, appellant confessed to entering and robbing

the home with Jeremy Martin while wearing a bandana over his face. He admitted having a gun during the incident but asserted that it was not loaded. He explained that the gun was missing the magazine that held the bullets and that he had to hold the gun in a specific way to keep the victims from seeing that the magazine was missing. Appellant asserted that he never intended to use the gun and that he was only there to perpetrate a robbery. Appellant explained that he and Mr. Martin ran out of the house when they saw that one of the adults in the home had a gun. After appellant confessed, the detectives took him to the police department so that he could provide a written statement. However, appellant was unable to do so at the second interview because appellant fell to the floor and "started to have what appeared to look like a seizure or some kind of medical incident." The detectives called an ambulance. Detective Malach explained that he went to the hospital a short time later and that appellant exhibited "no signs of being sick or ill." Appellant informed the detectives that he was not going to cooperate further without a lawyer.

During cross-examination, Detective Malach stated that appellant's interview in the car was not recorded because the police car was not equipped to make such recordings. Detective Malach agreed that he had no reason to believe that appellant faked having a seizure.

Mark Sloan, a lieutenant with the LaVergne Police Department who was responsible for the Crime Suppression Unit, testified that he discovered a large, dark-colored purse lying on the front steps of the substation where his office was located. He stated that the substation was locked and was not accessible to the public, so he assumed that a private citizen had found the purse and left it there for law enforcement to find. Lieutenant Sloan explained that he turned the purse into the police station and that the purse was eventually given to the Hendersonville Police Department.

Neal Harris, a detective with the Hendersonville Police Department, testified that he responded to the scene of a home invasion where two black males had entered the home, held the family at gunpoint, and stolen a purse. Detective Harris explained that Mr. Martin became a suspect after text messages to Zachary led him to Kelsey. Through Kelsey, Detective Harris identified Mr. Martin. Kelsey placed a recorded call to Mr. Martin. Detective Harris arrested Mr. Martin the morning after the incident. On the drive back to the police station, Mr. Martin admitted participating in the home invasion and showed the officers which house belonged to appellant, whom he referred to as "Money." Ten days later Mr. Martin and Mr. Woodley identified appellant from a driver's license photograph. Detective Harris arrested appellant on November 2. Appellant's mother provided the arresting officers with appellant's medications. The officers then drove to the Lavergne Police Department to retrieve the victim's purse that had been found and let appellant use the restroom before driving back to Hendersonville. The officers read appellant his *Miranda*

rights when they got back inside the car because appellant was inquiring about his charges. Detective Harris stated that appellant initially denied participating in the home invasion. However, after being confronted with Mr. Martin's claims, appellant admitted perpetrating the robbery with a gun, but he asserted that the gun did not have a magazine in it. Appellant told Detective Martin that he had put a gun to Zachary's head after Zachary answered the door and that Mr. Martin had gone upstairs while he remained at the base of the stairs. Appellant also admitted grabbing a purse before he ran out of the house after Mr. Martin had fled.

After appellant had provided this statement, the officers took appellant to the police department so that appellant could write down his statement. However, after appellant was placed in the interview room, appellant told Detective Harris that he did not feel well, and the officers called an ambulance. Detective Harris and Detective Malach went to the hospital afterward, and appellant appeared "fine." Appellant told Detective Harris that his mother had asked him not to cooperate with law enforcement without a lawyer. Detective Harris opined that he "never had any doubts as to who was responsible." He stated that when he initially responded to the scene, everyone knew that there had been an orange and a red bandana but that he received inconsistent statements as to who was actually wearing which bandana. However, Detective Harris stated that "it was consistent throughout that the first person through the door, the one that had the gun, the one that held the family on the floor with the gun, was the taller one and was the one with the black[,] square[-]framed glasses . . . ."

During cross-examination, Detective Harris agreed that he did not find either the purse or a gun in appellant's possession when appellant was arrested. Detective Harris also conceded that there were no fingerprints, footprints, or DNA linking appellant to the home invasion. Detective Harris agreed that he never attempted to search either Mr. Martin's or Mr. Woodley's car or home to determine if they had any glasses. The State then rested its case-in-chief.

Appellant presented two witnesses. Pamela Taylor, appellant's mother, testified that appellant had graduated from high school and that while in school, appellant had taken resource classes in math, English, and reading. Ms. Taylor explained that appellant had a history of seizures and that he had been prescribed medication for his seizures. Ms. Taylor testified that on October 17, 2010, appellant was at or within sight of her home for the entire day. She stated that appellant ate dinner at her home that night and then went upstairs with his fiancée after the meal. Ms. Taylor asserted that appellant could not have left her home after the meal without her knowledge because the security alarm was engaged and only she and her husband knew the code to turn off the alarm. The alarm was not activated that night.

Sierra Turner, appellant's fiancée, testified that on October 17, 2010, appellant was at or within sight of their home for the entire day. She explained that appellant ate dinner with their family and then she and appellant cleaned the dishes afterward. Ms. Turner stated that after dinner she and appellant went upstairs to get ready for bed and that she and appellant slept in the same bedroom that night. Ms. Turner asserted that appellant never left the house after dinner nor anytime during the night. When Ms. Turner awoke the next morning, appellant was present. Ms. Turner also stated that she never heard the house alarm sound that night.

After hearing the testimony presented and reviewing the evidence, the jury convicted appellant of aggravated burglary, aggravated robbery, employing a firearm during the commission of a dangerous felony, and three counts of aggravated assault. The trial court sentenced appellant to incarceration for three years for the aggravated burglary conviction, twelve years for the aggravated robbery conviction, six years for the firearm conviction, and three years for each count of aggravated assault. The trial court aligned all sentences concurrently except the three-year aggravated burglary conviction and the six-year employing a firearm during the commission of a dangerous felony conviction, which were aligned consecutively, for a total effective sentence of twelve years.

## II. Analysis

Appellant now argues that: (1) there was insufficient evidence to support his convictions; (2) his conviction for employing a firearm during the commission of a dangerous felony violates his double jeopardy rights; (3) the trial court erred by refusing to allow a lay witness to testify regarding appellant's mental and physical health; and (4) the trial court erred by refusing to allow appellant to introduce the entirety of his videotaped interrogation. The State responds that there was sufficient evidence to support appellant's convictions; that appellant's double jeopardy rights were not violated; and that the trial court properly excluded testimony regarding appellant's mental and physical health and the video showing appellant's seizure. We agree with the State.

### A. Sufficiency of the Evidence

Specifically, appellant argues that the evidence at trial was insufficient to prove that he was one of the perpetrators involved in the home invasion due to the inconsistent testimony of the witnesses, lack of physical evidence tying appellant to the scene of the crime, and his two alibi witnesses.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for aggravated burglary, the State must prove beyond a reasonable doubt that appellant entered a habitation without the effective consent of the property owner "with intent to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a)(1), -403(a). Aggravated burglary can be proven through direct or circumstantial evidence. *See State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). Aggravated burglary is a Class C felony. Tenn. Code Ann. § 39-14-403(b).

To support a conviction for aggravated robbery, the State must prove beyond a reasonable doubt that appellant committed robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id.* § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of

property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). Aggravated robbery is a Class B felony. *Id.* § 39-13-402(b).

To sustain a conviction for employing a firearm during the commission of a dangerous felony, the State must prove beyond a reasonable doubt that appellant employed a firearm during the commission of a dangerous felony. *Id.* § 39-17-1324(b)(1). Aggravated burglary is included in the crimes identified as dangerous felonies. *Id.* § 39-17-1324(i)(1)(H). Employing a firearm during the commission of a dangerous felony is a Class C felony.[2] *Id.* § 39-17-1324(h).

To support a conviction for aggravated assault, the State must prove beyond a reasonable doubt that appellant intentionally or knowingly committed an assault that "involved the use or display of a deadly weapon." *Id.* § 39-13-102(a)(1)(A)(iii). "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2). Aggravated assault is a Class C felony. *Id.* § 39-13-102(e)(1)(A)(ii).

The jury convicted appellant of aggravated burglary, aggravated robbery, employing a firearm during the commission of a dangerous felony, and three counts of aggravated assault. Viewed in the light most favorable to the State, the evidence supports these convictions. The evidence at trial showed that on October 17, 2010, appellant and Mr. Martin knocked on the door of a home, and after the family opened the door, appellant entered the home wearing a bandana covering his face and holding a gun. Appellant pointed the gun at Zachary as he entered the home. The men ordered the three family members in sight to lie on the ground and demanded to know where the family stored their money and weapons. However, when the men heard movement upstairs, appellant grabbed Cathy's purse, and both men ran out of the home.

Contrary to appellant's arguments that there was insufficient evidence to prove that he was one of the perpetrators, Mr. Martin, Mr. Woodley, Chareece, and Kelsey all testified that appellant was with them on the night of the home invasion and that appellant left Kelsey's apartment complex with Mr. Martin for a period of time that coincided with the home invasion. Kelsey testified that she gave Mr. Martin red and orange bandanas. Appellant also told Mr. Martin that he wanted to commit a robbery. Furthermore, Mr. Martin testified that appellant went with him to the home and that appellant wielded a gun during

---

[2] Tennessee Code Annotated section 39-14-1324(h)(1) states that a defendant who does not have a prior felony conviction at the time of the offense must be sentenced to a mandatory, minimum six-year sentence. Appellant had no prior felony convictions at the time of the offense, so the trial court properly sentenced appellant to six years for his firearm conviction.

-11-

the incident. The victims also testified that the perpetrator holding the gun wore glasses similar to appellant's glasses. Mr. Martin, Mr. Woodley, and Chareece all testified that appellant had a bag/purse that he threw out of the car window after the incident. In addition, Detective Harris testified that after appellant's arrest, appellant admitted to the commission of the offenses and that appellant provided specific details about the offense. Although there were inconsistencies in the testimony regarding the type of glasses worn by appellant on the night of the crime, appellant's exact height, and whether appellant wore an orange or red bandana, the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). We will not reevaluate the jury's determinations in that regard. The evidence here was sufficient to support appellant's convictions, and appellant is without relief as to this issue.

## B. Double Jeopardy

Appellant argues that his conviction for employing a firearm during the commission of a dangerous felony violates his double jeopardy rights because both this conviction and his aggravated robbery conviction arose from the same act or transaction and because all of the elements of this conviction are included within the elements of aggravated robbery. The State concedes that appellant's convictions for aggravated robbery and employing a firearm during the commission of a dangerous felony all arose from the same criminal episode. However, the State argues that the elements of each crime are different; therefore, appellant's double jeopardy rights were not violated.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Courts have interpreted the Double Jeopardy Clause as providing three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012) (citations omitted). "The United States Supreme Court has declared that '[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.'" *Id.* at 542 (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)). In such cases, also known as "single prosecution cases," the Double Jeopardy Clause functions to prevent trial courts from fixing punishments in excess of that which was authorized by the legislature. *Watkins*, 362 S.W.3d at 542. "Single prosecution cases" lend themselves to claims of multiple punishment in two distinct ways,

"unit-of-prosecution" and "multiple description" claims. *Id.* at 543. "Unit-of-prosecution claims arise when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the 'same offense.'" *Id.* Our appellant at bar was convicted of violating two different statutes, requiring this court to employ an analysis of a "multiple description claim" on direct appeal. *See id.* "Multiple description claims arise in cases in which defendants who have been convicted of multiple criminal offenses under different statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" *Id.* at 544.

In *State v. Watkins* our supreme court held:

In multiple description cases, when determining whether two statutes define the same offense, the United States Supreme Court long ago declared that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

*Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). An analysis of *Blockburger* examines "the statutory elements in the abstract, without regard to the proof offered at trial in support of the offenses." *Watkins*, 362 S.W.3d at 544. Under *Blockburger*, "[i]f each offense includes an element that the other offense does not, 'the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" *Id.* (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)); *see also Illinois v. Vitale*, 447 U.S. 410, 416 (1980) (noting that *Blockburger* "focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial"). Our supreme court opined:

The *Blockburger* test has been credited with serving at least two purposes. First, the *Blockburger* test is described as remaining "loyal" to the text of the Double Jeopardy Clause, which proscribes multiple punishment for the "same offense" and does not proscribe multiple punishment for the "same conduct." Second, the *Blockburger* test has been characterized as preserving the appropriate separation of powers by focusing the analysis upon legislative intent, rather than upon a defendant's conduct or the proof introduced at a particular trial.

The *Blockburger* test also has been described as promoting "two important practical implications." First, because the *Blockburger* test evaluates the statutory elements of the offenses without reference to the proof offered at

-13-

trial, "a motion to dismiss one count or one indictment based on multiple punishment grounds can be decided prior to trial by simply comparing the statutes, and a defendant who is charged improperly will not have to undergo the anxiety of a trial before the error is redressed." Second, because the *Blockburger* test focuses on statutory elements rather than proof, "a court can review a multiple punishment claim without a time-consuming review of the trial transcript."

*Watkins*, 362 S.W.3d at 544-45.

Application of *Blockburger* involves a two-prong analysis; courts must determine the threshold inquiry under *Blockburger*, which is "whether the alleged statutory violations arise from 'the same act or transaction.'" *Id.* at 545. If the answer is negative, there cannot be a violation of double jeopardy, thus courts may end the analysis here. *Id.* If the answer is affirmative, a double jeopardy violation *could* be present, and the court must look to the second factor of *Blockburger*. *Id.* (emphasis added). "Where the threshold is met, meaning the convictions arose from the same act or transaction, a court next examines the statutes to determine whether the crimes of which the defendant was convicted constitute the same offense." *Id.* (citing *Blockburger*, 284 U.S. at 304). If each offense includes an element not contained in the other offense, the statutory offenses are distinct. *Id.* at 545-46 (citing *Blockburger*, 284 U.S. at 304). In this case, courts presume that the legislative body intended to allow for multiple or separate punishments for the offenses. *Id.* at 546.

Both appellant and the State agree that the first prong of the *Blockburger* test has been met, and we agree. Therefore, we will focus our analysis on the second prong of the *Blockburger* test: an examination of the statutes to determine if appellant's aggravated robbery conviction and employing a weapon conviction constitute the same offense.

Tennessee Code Annotated section 39-13-401 states that aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). The trial court properly instructed the jury that the elements of this offense are:

(1) that the defendant knowingly obtained or exercised control over property owned by Cathy []; and

(2) that the defendant did not have the owner's effective consent; and

-14-

(3) that the defendant intended to deprive the owner of the propery; and

(4) that the defendant took such property from the person of another by the use of violence or by putting the person in fear; and

(5) that the defendant took such property intentionally or knowingly; and

(6) that the defendant accomplished this act with a deadly weapon or by display of any article used or fashioned to lead the alleged victim to reasonably believe it to be a deadly weapon.

In contrast, Tennessee Code Annotated section 39-17-1324(b)(1) criminalizes employing a firearm during the commission of a dangerous felony. Included in the crimes identified as dangerous felonies is aggravated burglary. *Id.* § 39-17-1324(i)(1)(H). The trial court properly instructed the jury that the essential elements of this offense are:

(1) that the defendant employed a firearm; and

(2) that the employment was during the commission of or attempt to commit [a]ggravated [b]urglary; and

(3) that the defendant acted either intentionally, knowingly[,] or recklessly.

The only element of these offenses that is the same is that the defendant must employ a firearm. The other elements of employing a firearm during the commission of a dangerous offense are different and, therefore, distinct from the elements of aggravated robbery. Because the elements of these two crimes are different, these are two separate offenses, and appellant is without relief as to his Double Jeopardy claim.

### C. Admissibility of Evidence (Appellant's Arguments III and IV)

Appellant also argues that the trial court erred by refusing to allow his mother to testify regarding appellant's mental and physical health and by refusing to allow appellant to introduce the entirety of his videotaped interrogation. The trial court determined that both of these offers of proof were irrelevant to the proceedings and excluded them from trial.

The determination of whether evidence is relevant and admissible at trial is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *State v. Dellinger*, 79 S.W.3d 458, 485 (Tenn. 2002); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). "Relevant evidence" is "evidence having any tendency to

-15-

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence is admissible unless specifically excepted by constitution, statute, rules of evidence, or rules of general application. Tenn. R. Evid. 402. One such exception is that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Tenn. R. Evid. 403, Adv. Comm. Note).

### 1. Lay Witness Testimony

At trial, appellant sought to introduce testimony from appellant's mother regarding appellant's mental health history, his past treatment facilities, and diagnosis. Appellant also sought to have his mother testify regarding his placement in resource classes and his reactions to questions and stressful situations. Although none of this testimony was placed on the record for appellate review, appellant argues that this testimony was relevant as to his ability to understand the officer's questions during his interrogation in the back of the patrol car, his ability to understand the consequences of confessing to the home invasion, and whether appellant actually confessed in the patrol car because the confession was not recorded.

The trial court limited Ms. Taylor's testimony to her personal knowledge of appellant's level of education, his having been a resource student, and his suffering from seizures. The trial court determined that testimony regarding appellant's mental history and understanding level at some other point in time was irrelevant to the proceedings and exceeded the scope as to what appellant's mother could testify.

To the extent that we can review whether this testimony was relevant without a proffer of Ms. Taylor's testimony to determine the exact testimony challenged, we conclude that the trial court did not abuse its discretion in limiting Ms. Taylor's testimony. There was no other testimony or evidence that indicated that appellant did not understand Detective Harris's questions or answer the detective's questions honestly. Appellant also did not file a motion to suppress his confession on the grounds that he was coerced or was intellectually disabled. Furthermore, appellant's reactions to a past instance of conduct are irrelevant to show whether appellant understood what was occurring during this particular interrogation. Appellant's mother was also not present during appellant's interrogation and could not speak to his mental state at the time. The trial court properly limited Ms. Taylor's testimony to her

knowledge of appellant's level of education, appellant's enrollment in resource classes, and appellant's tendency to have seizures.

However, even if a proffer of proof had revealed that this testimony was relevant to an issue at trial, any error by the trial court would be harmless due to the overwhelming evidence of guilt against appellant. Finally, to the extent that appellant also argues that the trial court erred by failing to allow Sierra Turner to similarly testify, appellant has waived this argument by failing to address her testimony in the body of his brief. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

## 2. Videotaped Confession

At trial, appellant also sought to play the entirety of his videotaped interrogation at the Hendersonville Police Department, which showed appellant having a seizure. Appellant argues that the video was relevant because it details the conversations between the officers and appellant and it elucidates appellant's mental health and state of mind immediately after his confession in the patrol car and prior to his having a seizure. Appellant also argues that the video shows appellant having an actual seizure, which would have rebutted Detective Malach's implication that appellant faked having a seizure because appellant exhibited no signs of illness later at the hospital.

After viewing the video, the trial court described the contents of the video as follows:

> It looks like [appellant] comes in the room. . . . [The officers] tell him he's going to jail. They give him a Coke. Then they leave the room. He takes off his glasses, and the [d]etective returns. And he talks about seizures and getting dizzy[,] and for about 7 minutes and 40 seconds to 17 minutes[,] he's on the floor appearing to have a seizure. There are sounds coming from [appellant]. Talking sounds. He throws up on the floor. Gives all the appearance of a seizure.

After hearing the arguments of appellant and the State, the trial court stated:

> I find that there is no relevance whatsoever in the fact of watching him having a seizure. Anything that the defense wants to accomplish can [be] accomplish[ed] through thorough and detailed cross-examination about any of the things that been testified to. There's been no denial that a seizure occurred; otherwise we could do it, but I see no relevance. I think it probably confuses issues.

-17-

We determine that the trial court did not abuse its discretion in this regard. The video does not show any substantive or substantial conversation between appellant and the detectives in which appellant's state of mind would be revealed. In addition, although appellant argues that showing appellant's actual seizure would counteract any implication that appellant faked his seizure, there is no such implication in the record. Detective Malach testified that appellant "fell on the floor and started to have what appeared to look like a seizure or some kind of medical incident. So we called the ambulance." Detective Malach also stated, "They took him to the hospital, and a short period of time later we went back to the hospital, and he was there. He had no signs of being sick or ill." However, Detective Malach did not testify that he believed appellant's seizure was not genuine. To the contrary, on cross-examination, Detective Malach agreed that he had no reason to believe that appellant faked having a seizure. The trial court did not abuse its discretion determining that the video had no relevance to a material issue and in refusing to allow the recording to be played for the jury. Appellant is without relief as to this issue.

## D. Merger

We note that a colleague has filed a separate opinion in which he concludes that the conviction for aggravated robbery and the conviction for one of the aggravated assault counts should be merged. However, this issue was not raised by the parties, so our review is limited to matters of plain error. After our review of *State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012), and the subsequent cases concerning this issue, we have concluded that the trial court's failure to merge the convictions and correct the judgments does not amount to a breach of a clear and unequivocal rule of law. *See State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

## CONCLUSION

Based on the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE